**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ACADEMY OF OUR LADY OF PEACE,

Plaintiff,

vs.

CITY OF SAN DIEGO; CITY COUNCIL OF THE CITY OF SAN DIEGO; and DOES 1 through 100, inclusive,

Defendants.

CASE NO. 09cv962-WQH-AJB

ORDER

HAYES, Judge:

The matter before the Court is Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion for Permanent Injunction. (Doc. # 17, 25).

**I. Background**

On May 5, 2009, Plaintiff Academy of Our Lady of Peace ("OLP") initiated this action by filing a Complaint in this Court against Defendant City Council of the City of San Diego ("City Council") and Defendant City of San Diego (collectively, "City"). (Doc. # 1). OLP is a nonprofit corporation which operates a Catholic, liberal arts, college-preparatory high school for young women. (*Id.* ¶ 3). The Complaint alleges that OLP's "existing campus facilities are woefully outdated and inadequate to meet OLP's mission" to educate and "inspire its students to grow as committed Christians." (*Id.* ¶¶ 12-13). OLP proposed a "Modernization Plan ... that would add two new facilities to the 84-year old campus: an approximately 20,545 square foot, two-story classroom building on the west side of the campus, and a two-level, 104-space parking structure on the east side of campus." (*Id.* ¶ 15). OLP's "Modernization Plan would

also require the demolition or removal of three single-family residences that OLP owns." (*Id*.) In 2007, OLP applied to the City for an amendment to its existing "Conditional Use Permit" ("CUP") and other use permits in order to implement OLP's Modernization Plan. (*Id*. ¶ 16). On March 3, 2009, the City Council denied the use permits necessary to implement OLP's Modernization Plan. (*Id*. ¶ 27). The Complaint alleges that "[t]he City's action[s] in ... rejecting the Modernization Plan have effectively precluded OLP from meeting its classroom space and program needs at its current campus.... The City's decision has imposed a substantial burden on OLP's religious mission because it cannot provide the Catholic education it exists to provide." (*Id*. ¶ 28).

The Complaint alleges thirteen causes of action related to the City's March 3, 2009 decision to deny the Use Permits. The first cause of action alleges a violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §2000cc, *et seq*. (*Id*. at 9). The next ten causes of action allege violations of OLP's right to free exercise of religion, freedom of speech, freedom of association, equal protection and due process, as secured by the First and Fourteenth Amendments to the United States Constitution, and Article 1, Sections 2-7 of the California Constitution. (*Id*. at 10-13). The first eleven causes of action seek compensatory damages, attorney fees and "an order declaring void the City's decision to reject the Modernization Plan, and instead directing that [the] City issue Use Permits allowing the Modernization Plan." (*Id*. at 16). The twelfth cause of action is a petition for writ of mandate pursuant to California Code of Civil Procedure § 1094.5, seeking an order directing the City to invalidate the March 3, 2009 City Council decision and issue the Use Permits necessary to implement the Modernization Plan. (*Id*. at 13-14). The thirteenth and final cause of action relates to the September 18, 2007 decision by an Administrative Law Judge employed by the City finding OLP in violation of the then-current CUP and ordering OLP to pay fines. (*Id*. at 14-16).

On May 26, 2009, Defendants filed a Motion to Dismiss the thirteenth cause of action of the Complaint. (Doc. # 6). On July 28, 2009, the Court granted the Motion to Dismiss and dismissed the thirteenth cause of action. (Doc. # 13).

On November 23, 2009, the Magistrate Judge conducted an Early Neutral Evaluation Conference. After the Conference, the Magistrate Judge issued an order which stated:

> There are central legal issues which can be addressed early on by way of a motion for summary judgment. Plaintiff will be filing a motion for summary judgment on or before January 15, 2010. Defendant will be opposing and the Court sets a telephonic Case Management Conference for April 12, 2010 at 9:30 a.m. to set further dates and deadlines as appropriate.... The record relative to the underlying dispute is complete and there is no need for disclosures under Rule 26 or formal discovery at this time. Should the Court find triable issues of fact do exist, any needed discovery can be dealt with after the dispositive motion.

(Doc. # 15 at 1).

On January 15, 2010, OLP filed the Motion for Partial Summary Judgment and the Motion for Permanent Injunction. (Doc. # 17, 25). OLP contends that it is entitled to judgment as a matter of law as to the Complaint's first cause of action that "the City violated ... RLUIPA ... when it rejected OLP's application for its 'Modernization Plan' ... in that the rejection imposed a substantial burden on the exercise of religion by OLP and its students and faculty." (Doc. # 17 at 1-2). According to OLP, "[i]f the Court grants summary judgment as requested, the [proposed permanent] injunction would command the City ... to approve the Modernization Plan in the form approved by the City's Planning Commission." (*Id*. at 2; *see also* Doc. # 25 at 1-2). OLP submitted numerous affidavits and exhibits in support of its motions. (Doc. # 17-26).

On February 17, 2010, the City filed an opposition to OLP's motions. (Doc. # 29). The City stated that "[d]ue to the limited nature of discovery and scope of this motion, Defendants rely exclusively on declarations and supporting documents submitted by Plaintiff." (*Id*. at 1).

On February 25, 2010, OLP filed a reply in support of its motions. (Doc. # 30).

On March 22, 2010, the Court conducted oral argument on OLP's pending motions. (Doc. # 31).

## II. Facts

### A. OLP and Religion

OLP is a Catholic high school for girls, the only single gender high school for girls in San Diego County. (Mahadevan Dec., ¶ 3, 2:23-24). OLP was founded in 1882 by the Sisters

of St. Joseph of Carondelet, an order of nuns dating back to France in 1650. (Anchondo Dec., ¶ 2, 2:3-8). OLP purchased its present location, in the North Park area of San Diego, in 1925 and moved its campus there in 1926. (Anchondo Dec., ¶ 2, 2:13-14, Ex. A:9-20). OLP's facilities have been consecrated and have long been used, and continue to be used, for religious services and activities. (Anchondo Dec., ¶ 2, 2:9–3:1, ¶ 4, 3:21-27). OLP's official Mission is "twofold: to assist and enable parents to fulfill their role as the primary educators, and to inspire its students to grow as committed Christians who are building Christ's kingdom of justice, love and peace" through a college-preparatory program. (Anchondo Dec., ¶ 3, 3:4-10). Crucifixes are present in every classroom. (Anchondo Dec., ¶ 5, 4:6). OLP requires students to pass a religious studies class each year to graduate. (Anchondo Dec., ¶ 4, 3:12-14). Each day begins with a prayer broadcast over the school's public address system, with additional prayers offered throughout the day. (Anchondo Dec., ¶ 5, 4:4-10). OLP's individual departments and classes are required to reflect OLP's religious purposes. (Anchondo Dec., ¶¶ 5-6). The City Council has repeatedly recognized OLP's religious nature and praised its value. (Mahadevan Dec., Ex. E:35–G:49).

**B. OLP's Facilities**

OLP's Principal stated in a declaration:

> OLP's facilities are inadequate, both in themselves and in comparison to standards, to be able to provide this Catholic education. Meeting these standards and having facilities comparable to other schools are important because about 98% of our graduates enroll in college.... I do not believe that OLP ... would be able to survive at all if we could not offer a competitive college-preparatory curriculum, for which we need the facilities in the Modernization Plan.

(Anchondo Dec., ¶ 7, 5:2-5; Ex. E:42).

OLP's Chief Financial Officer submitted a declaration outlining the following "specific problems" with OLP's current facilities:

> (a) Religion teachers must float between classrooms, rather than having a dedicated religion classroom. (Mahadevan Dec., ¶ 9a, 5:3-6).
>
> (b) There are fewer science labs than needed for OLP's students. (Mahadevan Dec., ¶ 9b, 5:7-18).
>
> (c) The existing computer room is inadequately small and contains view-blocking pillars. (Mahadevan Dec., ¶ 9c, 5:19-23, Ex. D:32).

(d) OLP's arts studios are too small and subject to physical constraints such as structural pillars in the way. (Mahadevan Dec., ¶ 9d, 5:24–6:11, Ex. D:30, D:33).

(e) OLP's administrative offices are small and scattered from each other and the activities being supervised. (Mahadevan Dec., ¶ 9e, 6:12-17, Ex. D:31).

(f) OLP's library is smaller than OLP's students need. (Mahadevan Dec., ¶ 9f, 6:18-22).

OLP's Chief Financial Officer stated that the Modernization Plan would have solved these specific problems, and "would have provided an integral campus with all parking, classroom and administrative space within a securable perimeter while preserving the historical areas of the campus and meeting our religious and operational needs for the foreseeable future." (Mahadevan Dec., ¶ 9, 4:27–5:2).

OLP submitted declarations indicating that OLP's current campus is subject to unusual site constraints, including steep slopes, restricted fire access, and historic, architecturally-valuable buildings. (Lia Dec., ¶ 8, 6:9-22; Mahadevan Dec., ¶ 2, 2:9-11, 14-15; Marshall Dec., ¶ 6, 4:6-10; McArdle Dec., ¶ 3a, 2:23-27; 3c–3f, 3:9–4:7). An architect submitted a declaration indicating that "OLP asked [his firm] to evaluate the merits of potential adaptive reuse of several existing buildings on campus, to convert current spaces into classroom and support uses so as not to need something like the Modernization Plan." (McArdle Dec., ¶ 4, 4:8-10). The architect stated that OLP's existing buildings do not meet structural standards for the proposed reuse, such as for height of classrooms, load bearing ability, ventilation, and compliance with disabled access requirements, and upgrades would be extensive and expensive. (McArdle Dec., ¶ 4a-4e, 4:21–6:12).

**C. City Planning Commission Decision**

OLP submitted its application for the Modernization Plan to the City in 2007. (Tunney Dec., ¶ 2-3, 2:5-22, Exs. A:8–F:45). The project went through extensive City review lasting over a year. (Tunney Dec., ¶ 4-6, 2:23–3:26, Exs. G:47–O:442). City staff determined that the Modernization Plan needed four use permits: a planned development permit for height, setback and use of tandem parking; a site development permit because part of the property contained steep slopes; an amendment to OLP's existing CUP to allow the school to have 750

students; and a neighborhood development permit, also for tandem parking. (Tunney Dec., ¶ 6, 3:14-23, Ex. N:206-207). OLP made frequent efforts to engage the community about the Modernization Plan. (Mahadevan Dec., ¶ 6, 3:15-24). OLP's architect stated that "OLP made numerous changes to its [Modernization Plan] proposal to accommodate, as best we could, neighbors' and City staff's concerns." (Mahadevan Dec., ¶ 8, 4:4-5).

In a report dated September 12, 2008, City staff recommended approval of the Modernization Plan. (Mahadevan Dec., ¶ 9, 4:24-25; Tunney Dec., Ex. N:204). The City staff report summarizes the Modernization Plan as follows:

> The current campus facility includes eight structures and two surface parking lots, in a primarily Mediterranean-style design. Three existing single-family structures adjacent to the property have been purchased by AOLP over the years and are proposed for demolition and incorporation into the modernized campus with this permit.... The school has exceeded the allowed enrollment as specified in [the CUP in effect at the time], which has resulted in the issuance of a Civil Penalties Administrative Enforcement Order by the City.... In conjunction with the terms of that order, the school is processing this permit request. The proposed development is proposed to address the current and future operational and academic needs of the school. ...
>
> The proposed project is a request for a Planned Development Permit, Site Development Permit, Conditional Use Permit and Neighborhood Development Permit to allow: a maximum annual enrollment of 750 students; demolition of three existing residential structures; construction of an approximately 21,059-square-foot, two-story classroom building; and construction of a new, two-level parking structure on the site. ...
>
> The applicant has stated that their primary objective in proceeding with this 'master plan' project is to modernize the Academy of Our Lady of Peace school and to allow the school to remain competitive in the current educational environment in San Diego. Recently opened parochial high schools in the area ... offer state of the art facilities, and the ability to attract new students to AOLP has become a challenge.... Currently, classrooms at the school are tucked into nooks, attics, closets, etc., in structures that were originally residences. While several classroom buildings were added over the years and the conversion of a former dormitory was accomplished, many current spaces used for classrooms are of inadequate size for normal education classroom functions.

(Tunney Dec., Ex. N:205-206). The staff report contains a statement from the Chair of the Urban Design/Project Review Subcommittee of the North Park Planning Committee, which states that the Subcommittee "voted to deny the project and the CUP amendment by a vote of 6-3-0." (Tunney Dec., Ex. N:211). The staff report states that "[t]he project is the subject of intense community interest." (*Id.*) The community concerns identified in the report involved parking issues and the proposal to "demolish three existing residential structures; two of which

have been determined to be locally significant based on their architectural features. The applicant has considered adaptive reuse of these structures, but based on classroom size requirements and library facility requirements, has determined these are not viable options. Accordingly, this situation has resulted in significant unmitigated impact. The decisionmaker will be required to make a Statement of Overriding Considerations in order to grant this request." (Tunney Dec., Ex. N:211-212).

OLP submitted memoranda and exhibits to the City Planning Commission stating OLP's position that its current facilities were inadequate and that adaptive reuse of OLP's existing facilities would not suffice. (Tunney Dec., Exs. O:395-414; P:444-447, 459-463, 470-471, 483-485).

On October 9, 2008, the City's Planning Commission voted 5-0 to approve the Modernization Plan with conditions. (Mahadevan Dec., ¶ 9, 4:24-25; Tunney Dec., ¶ 8, 4:6-7, Ex. S:542-554). A local ad hoc group, called "Between the Heights," and the North Park Planning Committee, the City's official community planning group for the area, appealed the Planning Commission's decision to the City Council. (Mahadevan Dec., ¶ 9, 4:25-26; Tunney Dec., ¶ 8, 4:7-9).

The City Council continued its hearing once to get more information and allow OLP and the project's opponents to attend mediation. (Tunney Dec., Ex. R:535; Williamson Dec., Ex. A:8:13-16). The project's opponents declined the mediation suggested by the councilmember even though OLP had offered to pay for it. (Williamson Dec., Ex. A:10:9-10, A:11:10-23, A26:5-10). The opponents' representative explained that the community members "feel like they've been going through mediation for three years, and they've given everything they have to give. They've agreed to everything that [OLP] was requesting in terms of square footage, in terms of facilities. The only request that they have is that [OLP] preserve[s] the three homes...." (Williamson Dec., Ex. A:11:14-19).

**D. City Council Decision**

During a meeting on March 3, 2009, the City Council voted on the permits necessary to implement OLP's Modernization Plan. (Williamson Dec., Ex. A:41:8-12). During the

meeting, the following findings were made by Councilmember Todd Gloria:

> Although the proposed project would implement objectives in the Greater North Park Community Plan for providing high-quality educational facilities and preserving open space and hillsides, the proposed project would eliminate two historic buildings located in the immediate neighborhood, located at 2544 Collier Avenue and 2765 Copley Avenue. According to the project's Environmental Impact Report, the proposal to remove the two architecturally significant structures conflicts with the community plan's objective in the urban design element for preserving the architectural variety and residential character of the Greater North Park community and preserving and restoring unique or historic structures within the community. The two structures have been characterized and associated with the Spanish eclectic architectural style, and their loss, as proposed by the project, would result in significant and unmitigable impact as stated in the [Environmental Impact Report]. Therefore, the project's proposal to remove the architecturally significant structures would adversely impact the Greater North Park Community Plan's objectives for preserving architectural variety and historic structures within the community, and this finding cannot be made.

(Williamson Dec., Ex. A:19:1-25, A:20:1-13). Councilmember Gloria stated:

> Based upon these findings and on the findings of the information contained in the staff report, I move that the Planned Development Permit Number 450668 and Site Development Permit Number 450706 be denied, and Conditional Use Permit Number 450705 and the Neighborhood Development Permit Number 590185 be granted in the form, exhibits, terms and conditions as set forth in Permit Number 450705.
>
> And based upon Staff's comments today, my motion does not include adoption of the statement of overriding considerations. Additionally, my motion includes two permit conditions that I'd like to add: First, that ... amendment to the CUP [and] NDP is required prior to the issuance of demolition or relocation permits for any building more than 45 years old located within the project boundaries; and Second, that within 60 days of the approval of the permit, Exhibit A shall be revised to reflect the City Council's actions including identifying buildings which are to remain to the satisfaction of City Staff.
>
> Even though it's my intention that the Site Development Permit and the Project Development Permit be denied, I want to be clear that I feel a project here is warranted, and I'm hopeful that OLP will bring forward a project that will enable it to meet the programmatic needs of its students while preserving the character of the surrounding community.
>
> I'm confident that this can be done and that, when it is, I'm confident that it will receive the support of the surrounding neighborhood and the Planning Committee. I find -- I just think that's entirely doable, but I don't know that that can be done today under these circumstances. With that, I restate my motion that the Council modify the Planning Commission's decision by denying the PDP and SDP but approving the CUP and NDP. This motion includes certifying the [Environmental Impact Report] and adopting the [Mitigation Monitoring and Reporting Program] for the no project/no development alternative with a modification for the parking described in that alternative as detailed in the revised permit and the [Mitigation Monitoring and Reporting Program] and that this motion is based on the findings already read into the record.

(Williamson Dec., Ex. A:20:14-25, A:21:1-25, A:22:1-2). The reference to "a modification for the parking" is further explained in the relevant Mitigation Monitoring and Reporting Program report: "[T]he parking deficit of 47 spaces ... would be eliminated by provision of 104 parking spaces via a combination of restriping of the existing on-campus parking areas and designated off-site parking areas ... within 60 days [from] the March 3, 2009 City Council Hearing." (Tunney Dec., Ex. T:580). The Mitigation Monitoring and Reporting Program report contains additional provisions mitigating "impacts associated with Transportation and Circulation." (Tunney Dec., Ex. T:580; *see also id*. at T:600-602).

Councilmember Gloria's motion was passed by the City Council by a vote of 5-3. (Williamson Dec., Ex. A:41:8-12).

In its written resolution memorializing the City Council decision, the City Council stated that "[t]he originally proposed project was a master plan to allow the school to address its operational and academic needs as a college preparatory school"; "[a] primary goal of the project is to ensure a safe, secure campus for the student population by providing additional on-site parking"; and "[t]he original proposed development plan would have improved the educational opportunities of residents attending the school and ensure the continuing viability of AOLP and continue the school's contributions to the community." (Tunney Dec., Ex. U:608-609, U:611). The City Council resolution also memorialized the findings made by Councilmember Gloria at the March 3, 2009 City Council meeting, quoted above, concluding that "the project's proposal to remove the [two] architecturally significant structures would adversely impact the Greater North Park Community Plan's objectives for preserving architectural variety and historic structures within the community...." (Tunney Dec., Ex. U:608, U:612-613).

**E. The Houses**

OLP owns the three houses at issue. (Mahadevan Dec., ¶ 2, 2:15-17). The City agreed that one of the three houses is not historically or architecturally significant. (Williamson Dec., Ex. A:19:8-12). The City viewed the two remaining houses as significant based upon their architectural style. (Tunney Dec., Ex. Q:499, Ex. N:209). According to the City's study, there

are at least a dozen architecturally similar houses within a few blocks of the OLP-owned houses at issue. (Lia Dec., ¶ 3, 3:8–4:6, Exs. E:180–F:196). The historic regulations of the City, state and federal governments allow the removal (i.e., relocation) of architecturally significant structures. (Lia Dec., ¶ 5, 4:14–5:7, Ex. H:211-212). The City has authorized the relocation of at least nine historic structures since 1995, including two to sites out of the City. (Lia Dec., ¶ 6, 5:8-23). The City has authorized the demolition of at least five historic structures since 1995. (Lia Dec., ¶ 7, 5:24–6:8).

On September 6, 2007, OLP's board of directors adopted a resolution pursuant to California Government Code § 37361 barring the City from designating the three houses as historic on the basis of OLP suffering a substantial hardship.[1] (Mahadevan Dec., ¶ 13, 7:24–8:2, Ex. C:23-24; Lia Dec., ¶ 4, 4:7-13, Ex. G:198-199). The City has not questioned the validity of this resolution. (Mahadevan Dec., ¶ 13, 8:2-3). The City staff report states: "The Board of Directors of [OLP] adopted a [resolution] of financial hardship pertaining to a religious exemption of [OLP] property from designation as a historical resource pursuant to Government Section 37361. Therefore, 2544 Collier Avenue and 2746 Copley Avenue properties are not, or would not be, listed in the City's or other historical register; however, disclosure of the impacts is required under [the California Environmental Quality Act ("CEQA")]." (Tunney Dec., Ex. N:209).

**F. Heritage Plan**

Some opponents of the Modernization Plan wanted OLP to hire David Marshall as an architect to propose a plan that would not require demolishing the houses. (Mahadevan Dec., ¶ 14, 8:4-6; Williamson Dec., Ex. A:30:19–31:12). During the pendency of this litigation, OLP hired Marshall and his firm ("Heritage") to perform that study. (Mahadevan Dec., ¶ 14, 8:6-8; Marshall Dec., ¶ 5, 3:2-19). Heritage proposed a plan that did not require removal the

---

[1] California Government Code § 37361 prohibits the involuntary historical designation of a "noncommercial property owned by any association ... that is religiously affiliated," provided the association ... objects to the designation and "the association ... determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association ... of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission, if the application is approved." Cal. Gov. Code § 37361(c).

three houses. (Mahadevan Dec., ¶ 14, 8:8-9; Marshall Dec., ¶ 6, 3:20-22, Ex. A).

OLP contends that the Heritage plan is infeasible for the following reasons:[2]

(a) The Heritage plan would require finding an alternative location, at great expense, for about half of OLP's classes for the year or two it would take to construct. (Mahadevan Dec., ¶ 14a, 8:11-20; Marshall Dec., ¶ 6a, 3:24–4:5).

(b) The Heritage plan increases the cost of the project by about eight million dollars, which OLP cannot foresee raising. (Mahadevan Dec., ¶ 14b, 8:21-22; Leverton Dec., ¶ 2, 2:10-12; Marshall Dec. Ex. A:76, 101). However, the cost of potential mitigation measures in the event the three houses are demolished has not been determined. (Marshall Dec., ¶ 6c, 4:13-14).

(c) The Heritage plan would divide the school's library into small spaces, impairing instructional value and necessitating the hiring of supervisory staff. (Mahadevan Dec., ¶ 14c, 8:23-26; Marshall Dec., ¶ 6e, 4:18-21).

(d) The Heritage plan would provide fewer parking spaces than the City had required. (Mahadevan Dec., ¶ 14d, 8:27–9:2; Marshall Dec., ¶ 6f, 4:22-26, Ex. A:58).

(e) The Heritage plan requires disruptive construction in the center of campus, while the Modernization Plan's construction was on the campus's periphery. (Mahadevan Dec., ¶ 14e, 9:3-5).

(f) The Heritage plan would require additional effort to provide an integral (i.e., secure) campus. (Marshall Dec., ¶ 6d, 4:15-17).

(g) Pursuing approval of the Heritage plan would require additional time and cost for City review and risk further litigation. (Mahadevan Dec., ¶ 14f-h, 9:6-13; Marshall Dec., ¶ 6a, 4:3-5).

(h) The Heritage plan raises its own issues about affecting potentially historic and architecturally valuable buildings. (Mahadevan Dec., ¶ 14i, 9:14-17; McArdle Dec., ¶ 4e, 6:9-12; Marshall Dec., Ex. A:57).

## III. Discussion

### A. Standard of Review

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of

[2] The City contends that it cannot respond to the facts related to the Heritage plan "until formal discovery has been completed." (Doc. 29-1 at 14-16).

the case. *See id.* at 248.

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (quotation omitted). "Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation omitted).

In ruling on a motion for summary judgment, "all justifiable inferences are to be drawn in [the non-moving] party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quotation omitted). At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

"Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper." *Miller*, 454 F.3d at 988 (citation omitted).

**B. Contentions of the Parties**

In the Motion for Summary Judgment, OLP contends that the City violated RLUIPA by denying OLP's application for the permits needed to implement the Modernization Plan. OLP contends: "RLUIPA applies because the City's actions affect commerce and because the City's actions implemented local land use rules"; "OLP is attempting to exercise its and its students' religious rights"; "the City imposed a substantial burden on these religious activities"; and "the City did not tailor its actions to a compelling interest." (Doc. # 17-1 at 6, 8, 12, 13). In the Motion for Permanent Injunction, OLP requests an injunction that "would command the City, including its agents, employees and those acting on its behalf or in concert with it, to approve without delay all discretionary permits necessary for OLP to proceed with

OLP's 'Modernization Plan' in the form approved by the City's Planning Commission." (Doc. # 25 at 1-2). "OLP makes this motion [for permanent injunction] on the grounds that, upon the Court's grant of partial summary judgment that the City violated ... RLUIPA ... by imposing a substantial burden on the free exercise of religion when the City Council rejected OLP's application for its 'Modernization Plan,' issuance of the requested injunction is necessary to ensure compliance with RLUIPA." (Doc. # 25 at 2).

The City contends:

> OLP's motion must be denied because Plaintiff has not shown the City's action, which allows Plaintiff to retain its entire existing *and projected* student body within the existing facilities successfully used to date by Plaintiff to accommodate the same 750 students, constitutes a substantial burden on its exercise of religion. This defect is further magnified by the fact that the City neutrally applied historical preservation laws and because the parking structure–covering two of the three controversial buildings–is not protected by RLUIPA. Moreover, the City's obligation to abide by state historic preservation guidelines under CEQA constitutes a compelling interest, and the City's requirement that if feasible, Plaintiff allow the historic structures remain onsite, constitutes the least restrictive alternative available to the City.

(Doc. # 29 at 3 (citations omitted)).

**C. RLUIPA**

RLUIPA establishes the following "general rule":

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). This general rule "applies in any case in which":

> (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;
>
> (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or
>
> (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the

property involved.

42 U.S.C. § 2000cc(a)(2).

The plaintiff bears the burden of persuasion on whether RLUIPA's general rule applies, and whether the land use regulation at issue imposes a "substantial burden" on plaintiff's "religious exercise." 42 U.S.C. § 2000cc-2(b). If plaintiff successfully carries its burden, the government bears the burden of persuasion on whether the imposition of the "substantial burden" is in furtherance of a compelling governmental interest, and is the least restrictive means of furthering that compelling governmental interest. *See id*.; *see also* 42 U.S.C. § 2000cc(a)(1).

**1. Applicability of RLUIPA**

OLP contends that RLUIPA applies because "the substantial burden affects ... commerce with foreign nations, among the several States." 42 U.S.C. § 2000cc(a)(2)(B). OLP has submitted evidence that OLP draws students from Mexico each year and has alumnae throughout the United States. (Mahadevan Dec., ¶ 3, 2:20-21, 2:24-28).

The City does not contest this evidence or OLP's contention that RLUIPA applies pursuant to 42 U.S.C. § 2000cc(a)(2)(B).

Accordingly, the Court concludes that RLUIPA applies in this case.

**2. Religious Exercise**

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C § 2000cc-5(7)(B).

OLP has submitted evidence indicating that OLP's existing classrooms–and the construction of new classrooms–fit within RLUIPA's definition of "religious exercise." (Anchondo Dec., ¶¶ 3-6). The City does not contest that the Modernization Plan's proposed construction of a two-story classroom building fits within RLUIPA's definition of "religious exercise."

The Court concludes that OLP has demonstrated, as a matter of law, that the proposed construction of a classroom building fits within RLUIPA's definition of "religious exercise." *See San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) ("Inasmuch as [the plaintiff] intends to convert the [p]roperty from hospital use to a place for religious education, it appears that a 'religious exercise' is involved in this case.").

**3. Substantial Burden**

"[A] 'substantial burden' must place more than an inconvenience on religious exercise." *Guru Nanak Sikh Soc'y v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (quotation omitted). "For a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Id.* (quoting *San Jose Christian College*, 360 F.3d at 1034). "[D]etermining whether a burden is substantial (and if so whether it is nevertheless justifiable) is ordinarily an issue of fact ... and ... substantiality is a relative term–whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question." *World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009); *cf. Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) ("On this record, where there is factual dispute as to the extent of the burden on Shakur's religious activities, the extent of the burden that would be created by accommodating Shakur's request, and the existence of less restrictive alternatives, we cannot conclude that summary judgment on the RLUIPA claim was appropriate.").

OLP contends that "[r]ejecting the Modernization Plan substantially burdened the exercise of religion.... The Modernization Plan would have solved OLP's existing problems, which include rooms that are cramped, undersized, and for some purposes simply absent; spaces that contain pillars blocking students' views; and ... the absence of a secure perimeter." (Doc. # 17-1 at 8-9). The City contends that "OLP's motion must be denied because Plaintiff has not shown the City's action, which allows Plaintiff to retain its entire existing *and projected* student body within the existing facilities successfully used to date by Plaintiff to accommodate the same 750 students, constitutes a substantial burden on its exercise of

religion." (Doc. # 29 at 3 (citations omitted)).

Viewing all reasonable inferences in the City's favor, the Court concludes that OLP has failed to show that it is entitled to judgment as a matter of law as to whether the City imposed a substantial burden on OLP's religious exercise. *See Miller*, 454 F.3d at 988 ("Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper.") (citation omitted). OLP has submitted evidence from which a reasonable jury could find that OLP's facilities are "inadequate" (Doc. # 17-1 at 3) and "cramped" (*id*. at 8). However, in light OLP's successful operation of the school for many years at or near its current and projected enrollment (Mahadevan Decl., Ex. F at 39, Doc. # 19), a reasonable jury could find that the City's actions did not "impose a significantly great restriction or onus upon [OLP's religious] exercise." *Guru Nanak*, 456 F.3d at 988; *see Hillcrest Christian Sch. v. City of Los Angeles*, No. 05cv8788, 2007 WL 4662042, at *5-*6 (C.D. Cal., July 12, 2007) ("In *Guru Nanak*, the substantial burden stemmed in part from the fact that, absent a CUP, the [plaintiff] lacked a temple in which to hold services. For the [plaintiff in *Guru Nanak*], the ultimate denial of a CUP placed its very existence in question. Hillcrest does not face the same dire burdens of uncertainty. Hillcrest already operates a school through which, by its own accounts, it prodigiously exercises its religious beliefs.") (finding, after a bench trail, that despite the claimed "onus of Hillcrest continuing to operat[e] within ... an inadequate and cramped facility," the city's denial of permits necessary to build a new campus for a religious school did not amount to a substantial burden under RLUIPA); *see also Int'l Church of Foursquare Gospel v. City of San Leandro*, 632 F. Supp. 2d 925, 941 (N.D. Cal. 2008) (granting the defendant city's motion for summary judgment on a RLUIPA claim despite the plaintiff's argument that "the Church's core functions are being inhibited by the inadequate facility in which the City has forced it to remain") (quotations omitted).

OLP has not submitted evidence that the burden is sufficiently substantial that the Court would conclude that OLP is entitled to judgment as a matter of law. *Cf. Guru Nanak*, 456 F.3d at 989 (affirming the grant of summary judgment for plaintiff, agreeing that the county

imposed a substantial burden "based on two considerations: (1) that the County's broad reasons given for its tandem denials could easily apply to all future applications by Guru Nanak; and (2) that Guru Nanak readily agreed to every mitigation measure suggested by the Planning Division, but the County, without explanation, found such cooperation insufficient"); *Grace Church of North County v. City of San Diego*, 555 F. Supp. 2d 1126, 1136 (S.D. Cal. 2008) (granting summary judgment in favor of plaintiff on its RLUIPA substantial burden claim, stating: "At various levels of Defendants' mandatory CUP process, Grace Church experienced outright hostility to its application, decision-making that is seemingly arbitrary or pretextual, and ignorance regarding the requirements of controlling federal law regarding the application of land use laws to religious institutions."); *Elsinore Christian Ctr. v. City of Lake Elsinore*, 291 F. Supp. 2d 1083, 1090 (C.D. Cal. 2003) (granting summary judgment in favor of plaintiff on a RLUIPA claim because "[t]he burden on the Church's use of land in this case is not only substantial, but entire. By denying the conditional use permit, the City has effectively barred any use by the Church of the real property in question.").

The Court concludes that OLP has failed to "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial" as to the issue of whether the City imposed a substantial burden on OLP's religious exercise. *Miller*, 454 F.3d at 987. Accordingly, OLP's pending motions are denied.

**IV. Conclusion**

IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment is **DENIED** (Doc. # 17), and Plaintiff's Motion for Permanent Injunction is **DENIED** (Doc. # 25).

DATED: April 1, 2010

William Q. Hayes

**WILLIAM Q. HAYES**
United States District Judge